**Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000948
13-DEC-2019
08:00 AM**

NO. CAAP-18-0000948

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

IN THE INTEREST OF N.F. AND A.F.

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(Case No. FC-S 17-00211)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Hiraoka, JJ.)

Appellant DF (**Father**) is the natural and legal father of twins, NF and AF (collectively, the **Children**). Father appeals from the "Order Concerning Child Protective Act" entered by the Family Court of the First Circuit[1] on November 13, 2018, awarding foster custody over Children to Appellee Department of Human Services (**DHS**). Children's mother (**Mother**) is not a party to Father's appeal. For the reasons explained below, we affirm the family court's order.

I.

On October 4, 2017, DHS filed a petition for temporary foster custody over Children. The family court conducted an evidentiary hearing on November 13, 2018. At the conclusion of the hearing the family court entered the order awarding DHS foster custody over Children. This appeal followed.

---

[1] The Honorable John C. Bryant, Jr. presided.

## II.

> [T]he family court possesses wide discretion in making its decisions and those decision will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (citation omitted). The family court entered findings of fact and conclusions of law on January 14, 2019. Father has not challenged the following findings of fact made by the family court:

> 27. On July 28, 2016, Mother gave birth to a female child, [EF], at Castle Medical Center, in the City and County of Honolulu, State of Hawaii [Hawai'i].
>
> 28. [Father] is the natural and legal father of [EF].
>
> 29. The Children are the natural siblings of [EF].
>
> 30. [EF] was the subject child in a previous Child Protective Act case under FC-S No. 16-00180.
>
> . . . .
>
> 73. The circumstances surrounding [EF]'s death are evidence of the reasonably foreseeable substantial risk of harm to the Children posed by the Parents in this case.
>
> 74. On the day of [EF]'s death, Father contacted the Department of the Medical Examiner directly to report that he had found his daughter unresponsive early that morning in her bassinet in a van in which they had been living. The Parents did not contact emergency services or police and instead placed the baby in a car seat in a different vehicle and drove around with the body for several hours before reporting the death. [EF]'s body was received approximately 18 hours after discovery and [EF] was officially pronounced dead at 9:00 p.m. on September 1, 2016.
>
> . . . .
>
> 78. Before presenting themselves at the medical examiner's office, the Parents drove around with [EF]'s body in the car and did "errands" which included withdrawing money from an ATM; waiting at a car repair shop for 2.5 hours until the shop opened; going to Wal-Mart to obtain phone cards; and going to Carls Jr. for breakfast.

Father has not challenged the family court's conclusions of law, which include the following:

> 8. The purpose of the Child Protective Act, Hawaii Revised Statutes (HRS) Chapter 587A, is to make paramount the

2

safety and health of children who have been harmed, or are in life circumstances that threaten harm. HRS § 587A-2.

9. A safe family home is a family home in which the child's parents or legal custodian can adequately provide for the child's physical and psychological health and welfare and thereby adequately protect the child from harm, be it actual, imminent, or threatened. In re Doe, 95 Hawai'i 183, 194, 20 P.3d 616[ ], 627 (2001).

10. When determining whether a child's family is willing and able to provide the child with a safe family home, the family court is required to fully consider the Safe Family Home Factors enumerated under HRS § 587A-7[.]

11. The Court may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the children may be reasonably expected to receive in the future. In re Doe, 95 Haw[ai'i] at 191.

Father challenges the family court's findings of fact nos. 72, 75, 79, 81, 82, 83, 96, 110, 112, 114, and 115:

72. Ms. Xiong's[2] expert opinion that the Children were subject to threatened harm was based upon the following identified safety issues: (a) death of a sibling due to uncertain circumstances; [(]b) impulsive or uncontrolled behavior by the Parents; (c) the Parents' histories of mental health problems; and (d) lack of safe and stable living arrangements.

. . . .

75. The Parents' behavior after [EF] was discovered unresponsive is evidence of threatened harm to the Children in this case: A reasonably safe and prudent parent would have immediately called 9-1-1 upon discovering their newborn child unresponsive. Neither Mother nor Father called 9-1-1 at any point after the discovery. This evidence is not limited to threatened harm; it also goes to safety of the family home and the appropriateness of the service plan.

. . . .

79. [Father's attorney] asked Ms. Xiong whether, given the Parents' belief that [EF] was already dead, their decision to go to the medical examiner's office instead of the hospital was reasonable. Ms Xiong replied that a safe and responsible parent would have taken the child, even if believed to be already dead, immediately to the medical examiner's office.

Ms. Xiong had concerns regarding how the Parents would respond if one or both of the Children suffered a medical emergency that required immediate attention. In this regard, Mother's and Father's behavior is dangerously impulsive and

---

[2] Jacqueline Espinueva-Xiong works for DHS as a child and adolescent protective services specialist, performing the work of a social worker.

uncontrolled, which is evidence of threatened harm to the Children. This evidence is not limited to threatened harm; it also goes to safety of the family home and the appropriateness of the service plan.

. . . .

81. The DHS was unable to contact or locate the Parents in the two weeks preceding [EF]'s death because they left paternal grandmother's home and discontinued contact with the IHBS worker. Similarly in this case, the Parents have no verifiable residence and they left the Children at the hospital without providing the staff with their contact information.

82. The Parents have transient and uncertain living arrangements and a history of becoming unreachable by the DHS and service providers, which is evidence of threatened harm to the Children in this case. This evidence is not limited to threatened harm; it also goes to the safety of the family home and the appropriateness of the service plan.

83. The Parents' [sic] each have a history of mental health problems and there is an absence of protective factors, such as monitoring by a mental health professional or other social services provider, to ensure child safety. This is evidence of threatened harm to the Children in this case. This evidence is not limited to threatened harm; it also goes to safety of the family home and the appropriateness of the service plan.

. . . .

96. The DHS social worker [Jacqueline] Espinueva-Xiong was a credible witness, and this Court accepts her testimony in whole.

. . . .

110. The Children's physical or psychological health or welfare have been harmed or are subject to threatened harm by the acts or omissions of the Children's family.

. . . .

112. It is contrary to the immediate welfare of the Children to remain in the family home.

. . . .

114. Mother is not willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

115. Father is not willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

(Footnote added.) The family court's findings of fact are reviewed under the "clearly erroneous" standard. Fisher, 111 Hawai'i at 46, 137 P.3d at 360. A finding of fact is clearly

erroneous when the record lacks substantial evidence to support the finding, or despite substantial evidence in support of the finding, we are nonetheless left with a definite and firm conviction that a mistake has been made.  Id.  "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.  Id.

Our review of the record shows that the family court's findings of fact were supported by substantial evidence. Jacqueline Espinueva-Xiong (**Xiong**) testified at the evidentiary hearing.  The family court found her to be a credible witness and accepted her testimony "in whole."  "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact."  Fisher, 111 Hawai'i at 46, 137 P.3d at 360 (citation omitted).

Xiong testified that she works for DHS as a child and adolescent protective services specialist, performing the work of a social worker.  The family court found her qualified to testify as an expert on child protective or child welfare services.[3] Xiong interviewed Father at the hospital shortly after Children were born.  Father told Xiong that he had been diagnosed with depression and post-traumatic stress disorder.  Xiong spent two hours with Father at the hospital but could not get a straight answer from Father about the discharge plan, mental health issues, domestic violence, where he was going to live, or who would care for the Children.  Father called his mother [**PGM** (Children's paternal grandmother)] and let Xiong speak with her. PGM told Xiong that Father and Mother used to live with her in the past, but they were no longer welcome there.  Xiong was concerned about Children's safety because Father and Mother were homeless.

---

[3]     Father has not appealed from the family court's qualification of Xiong as an expert witness.

Xiong was also concerned about the circumstances surrounding the death of Children's older sibling, EF. EF died when she was about 1 month old. Xiong testified that Father blamed "CPS and the FBI" for EF's death. When EF was born, DHS agreed to provide Father and Mother intensive home-based services provided they live with PGM. After two weeks, Father and Mother left PGM's home and stopped participating in the intensive home-based service plan. DHS was unable to locate Father, Mother, or EF. Shortly thereafter, DHS received a call from the office of the Medical Examiner (**ME**). Xiong's Safe Family Home Report, dated October 2, 2017, and received in evidence as State's exhibit 1, reported:

> Medical Examiner received a call from [Father] and stated that [Mother] and [Father] were coming to the office to bring in their deceased child, [EF]. [Father] reportedly stated they did not want HPD or the ME office involved and wanted to bring their child to find out the cause of death. [Father] called about 3:30 pm and by 8:30 pm the same day, [Father] and [Mother] did not arrive at the ME's office.
>
> DHS records indicated per the Medical Examiner, [Mother] had fed and wrapped the infant before placing the child in a bassinet; the infant was then found unresponsive in the same position — the mother woke father up who allegedly performed CPR and massaged the infant's chest. The parents then placed the infant in a car seat of another vehicle, covering the infant with blanket and trash bag. The parents then ran "errands" for the next five hours — withdrew money from ATM; drove to an auto repair shop where they waited 2 ½ hours until the shop opened; obtained phone cards from Walmart, and ate breakfast at Carl Jr's.
>
> [Father] and [Mother] contacted the ME's office at 3:30 pm—infant was found unresponsive at 2:50 am. 13 hours later, [Father] stating they would bring the infant but they did not show up until 9:30 p.m., 6 hours after stating they would bring in the infant. The parents reported they were eating at Zippy's.
>
> The ME's office reported trash bag was covering the infant in the car seat; the infant appeared to be sweating, lips discolored and very dark, red marking on right face and nose. The mother reportedly did not show emotion, no grief or crying; the mother seemed as if she had done that before, and the father did all the talking.

On cross-examination, Xiong explained:

> This is a safety concern for me so that if the child was already dead, I mean, reading it, child was already dead, that they thought the child was already dead, it took them several hours to get to the medical examiner's office. You

would think -- you would think that if a child is already dead, they would have called -- gone to the medical examiner office right away. Instead, they had run errands.

This alone -- their behavior alone in that, it would lead me to think, okay, there's some safety concerns here that if -- if they would have this behavior and if they would have -- if the twins are under the care, what happens -- what happens when there is an emergency? What happens when the kids -- emergency for the twins and they're not able to get to the, let's say, doctor's right away. And this same behavior would be the same as when -- if they're taking care of [the Children]. What if?

. . . .

I mean, I have to take that into consideration, [counsel], I have to. We're talking about twins, newborns. We're talking about parents that has [sic] not resolved safety issues from when [EF] was alive, from when [EF] died, and now I've got twins in my hand.

Q      Would it be a fair statement to say that you assessed parents' safety as a unit when you were looking at the twins as opposed to Mother's safety and Father's safety?

A      I look at the whole information, [counsel]. I make sure that the whole -- I got the whole information for me. For me to assess, I don't just assess one single parent. I obviously assess the whole entire thing.

I assess Dad, I assess Mom, I assess situation, where they're gonna go, who's going to be there, who's going to be taking care of them, who's going to be taking care of the infants to go to the nurse -- to the hospital, so on and so forth. I assess that whole situation.

That's including the death of a sibling and what happened surrounding that -- that -- that day when [EF] had died. I mean, I take that whole. I don't take safety for granted. I make sure that, you know, the kids, when they have to be discharged to their parents, make sure that safety is in place.

That's just my opinion, [counsel].

Xiong's Safe Family Home Report concluded that Father's "home is unsafe and temporary foster custody of the child [sic] is needed to protect the child [sic] from imminent harm." The conclusion was

based upon Father's mental health issue. It's based upon the living arrangement, their homelessness. It's based upon also the death of a sibling, and it's also based upon their, parents', behavior, uncontrolled -- uncontrolled behavior.

The family court heard testimony from Elizabeth Brown (**Brown**), the DHS social worker who was then handling the

Children's case.  The parties stipulated, and the family court qualified Brown as an expert in social work, child welfare and child protective services.  The family court found her to be a credible witness and accepted her testimony "in whole."  The family court made the following findings of fact — none of which are challenged by Father — based on Brown's testimony:

> 90.  DHS social worker/case manager Elizabeth Brown ("Ms. Brown") has conducted ongoing assessments to determine whether the Parents are willing and able to provide the Children with a safe family home, even with the assistance of a service plan.

> 91.  In order to facilitate the return of the Children to the family home, Ms. Brown would first have to assess said family home as safe.  In order to conduct such an assessment, Ms. Brown would have to visit the family home.

> 92.  Ms. Brown has been unable to visit the family home because the Parents have repeatedly refused, and continue to refuse to tell Ms. Brown where they are currently living.

> 93.  Ms. Brown testified that a physical, residential address is not required, and that homelessness alone is not a safety concern.  Parents could live in places such as a shelter or on the beach, provided that the living situation is assessed as safe.

> 94.  The Parents' refusal to tell Ms. Brown where they are living is a barrier to reunification that is of their own making.

> 95.  The Parents have been given the opportunity to engage in the services recommended by the DHS in the October 2, 2017 and June 25, 2018 service plans.  They have chosen not to participate in any services except that they have each submitted to a psychological evaluation.  The identified safety issues in this case remain unresolved.

The family court heard testimony from John Wingert, a clinical psychologist.  The family court made the following findings of fact — none of which are challenged by Father — based on Dr. Wingert's testimony:

> 100.  Dr. John Wingert, PhD., was a credible witness, and the Court accepts his testimony in whole.

> . . . .

> 105.  Dr. Wingert conducted the psychological evaluation regarding Father on September 26, 2018 and October 3, 2018.

106. Father informed Dr. Wingert that he is unwilling to participate in a DHS service plan because he does not regard himself as needing services.

107. Dr. Wingert determined that Father's suspiciousness and distrust may cause him to not seek help in times of need, and that this would impact his parenting and his addressing the needs of his children.

108. The psychological evaluations were received in evidence without objection by any party.

In this case, all of the family court's findings of fact challenged by Father were supported by substantial evidence and are corroborated by other findings of fact from which Father has not appealed. We are not left with a definite or firm conviction that the family court made a mistake.

## III.

For the foregoing reasons, the "Order Concerning Child Protective Act" entered by the family court on November 13, 2018, awarding foster custody over Children to DHS is affirmed.

DATED: Honolulu, Hawaiʻi, December 13, 2019.

Chief Judge

Associate Judge

Keith K Hiraoka

Associate Judge